Cite as 2021 Ark. App. 269

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR–20–391

| | |
|---|---|
| JOSHUA ADAM DEVAULT | **Opinion Delivered** May 26, 2021 |
| APPELLANT | APPEAL FROM THE VAN BUREN COUNTY CIRCUIT COURT |
| V. | [NO. 71CR-18-45] |
| | |
| | HONORABLE H.G. FOSTER, JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Joshua DeVault appeals after he was convicted by a Van Buren County

Circuit Court jury of rape. He was sentenced to serve three hundred months' imprisonment

in the Arkansas Department of Correction. On appeal, appellant does not challenge the

sufficiency of the evidence for his conviction. Instead, he argues that his conviction should

be reversed and remanded for a new trial because the circuit court erred in limiting his cross-

examination of the victim's mother, Sasha Hughes. We affirm.

I. *Relevant Facts*

Appellant and Sasha Hughes[1] were married in 2011. Ms. Hughes has two daughters,

M.W. and G.S.; appellant has another daughter; and appellant and Ms. Hughes have a son

together. At the time of the rape, appellant, Ms. Hughes, and the four children lived

___

[1]We note that, at times, Sasha Hughes is referred to in our record and at trial by the
name Sasha Shivers, which was her maiden name.

together in a two-bedroom home. On the night of July 5, 2017, appellant raped his stepdaughter, M.W. The next day, M.W. broke down and told her mother that appellant had come into her room during the night and raped her as he had done many times before. Ms. Hughes took M.W. to the police department and then to Arkansas Children's Hospital for a sexual-assault examination. Appellant was subsequently arrested and charged by amended felony information with rape in violation of Arkansas Code Annotated section 5-14-103(a)(4)(A)(i) (Repl. 2013), a Class Y felony. A jury trial was held on November 15–16, 2019.

Shortly after the arrest and before the results of the rape kit that confirmed the presence of appellant's DNA were released, Ms. Hughes sought an order of protection against the appellant. During a hearing for the order of protection, Ms. Hughes testified regarding the rape and whether she believed M.W.'s account. Ms. Hughes stated, "I'm on her side. And I want to show I am there for her. Whenever I look at things from an unbiased standpoint, I don't see any evidence and some of the things she says don't line up." In a hearing before trial below, appellant argued that he intended to use the transcript from the order-of-protection hearing to impeach Ms. Hughes as a prior inconsistent statement. The circuit court took the matter under advisement.

At trial, Robert Leal, a former investigator for the Van Buren County Sheriff's Office, testified that he had been assigned in July 2017 to investigate appellant's case. When he learned that M.W. alleged that appellant had sexual contact with her within the last twenty-four hours, Mr. Leal immediately sent her to Arkansas Children's Hospital for a sexual-assault examination and to have a rape kit conducted.

Emily Davis, a nurse practitioner for University of Arkansas for Medical Services at the campus of Arkansas Children's Hospital, testified that she has specialized training as a sexual-assault-nurse-examination (SANE) nurse and that she examined M.W. She described M.W.'s demeanor as tearful before and during the examination. Nurse Davis testified that she did not notice any physical signs of trauma during her examination; however, she stated that she would not expect to see any physical signs of tearing or trauma to a fourteen-year-old girl who had already started her period if she had "typical" sexual intercourse with a man. She explained that typical intercourse meant not forceful. Therefore, Nurse Davis explained that the lack of physical findings neither confirmed nor negated a history of sexual abuse. During the examination, Nurse Davis collected several swabs and included them in the sealed rape kit for analysis.

Dr. Charlotte Renee Willis testified that M.W. was her patient at Arkansas Children's Hospital. She and her team made the decision to order the rape kit based on the history that was presented to them. Dr. Willis testified that she was in the room when Nurse Davis examined M.W. Dr. Willis agreed with Nurse Davis's findings and stated that there were no physical findings present. She further testified that under 5 percent of abused children will have abnormal findings on just a physical examination.

Grant Hupp testified that he had previously worked as a forensic DNA analyst at the Arkansas State Crime Laboratory. While employed there, he examined vaginal, rectal, and oral swabs along with a known DNA sample taken from M.W. Mr. Hupp testified that he found two individual's DNA on the vaginal swab. The first was M.W.'s, and the other DNA profile was retained for comparison purposes at a later date. Lieutenant Frank Bricklin

Lewis testified that he obtained a DNA sample from appellant by swabbing the inside of each of his cheeks. Alexa Harrod, a DNA analyst at the Arkansas State Crime Laboratory, testified that appellant's DNA matched the DNA found on the vaginal swab within scientific certainty. Ms. Harrod explained that "within all scientific certainty" means a 1 in 19.4 nonillion chance in the Caucasian population. On cross-examination, Ms. Harrod admitted that a serology test was not conducted to determine if the DNA found was skin, saliva, or semen. However, she explained that a serology test was not standard procedure at that time if DNA was found. She further explained that the samples were retained and that someone else could have requested a serology test to be performed if desired.

Before Ms. Hughes testified, the State again raised the issue of whether appellant was permitted to introduce the copy of the transcript from the separate order-of-protection case. The State argued that it should be suppressed under Arkansas Rules of Evidence 401 and 403. Although appellant argued that it should be allowed to prove a prior inconsistent statement, the State explained that it must still be excluded under the other rules of evidence and that whether M.W. was telling the truth was ultimately for the jury to decide. After both parties had orally argued their positions, the circuit court ruled as follows:

> We started all this when Mr. Brown [on behalf of the State] moved to suppress reference to the order of protection hearing and what happened in the order of protection hearing. Ms. Byrd [defense counsel] responded that she wanted to go into prior inconsistent statements that were made within the context of the order of protection hearing. I said that prior inconsistent statements can absolutely be used, consistent with the rules of evidence but there would be no reference to the order of protection. We have continued to talk about it some more and the issue was put forward, well, wait a minute, let me question, is it your opinion that she is going to want to impeach her with, that is not an admissible question. I agree that is not an admissible question. I understand Ms. Byrd disagrees with that and you have expressed why on the record. My thought was yesterday morning that I kind of made it clear that we weren't going to go into mom's changing opinion of different things

4

and that we were not going to go into mom's decision ---- I think I even said it is not relevant whether mom thinks two and two equals four or now she thinks two and two equals five. It doesn't matter. So we are not going to talk about the order of protection proceeding. If there have been prior inconsistent statements made by any witness that the rules of evidence allow them to be used, they will be used and they will be used consistent with the rules of evidence. The question about her mom believing or not believing will not be asked. I do not believe that is relevant. I think it is highly prejudicial. The question about whether in mom's opinion different things add up will not be asked. There are too many problems with that. One, it is mom's opinion; two, it really doesn't raise the ultimate issue; three, it presupposes that everybody knows what things mom is aware of that she thinks why and don't join up. I don't know what mom knows. I don't know that anybody does. I don't know that mom knows everything that she knows and she certainly doesn't know what she doesn't know so taking it from the top: Not going to talk about the order of protection. Prior inconsistent statements of a witness can be used consistent with the rules of evidence. The question about mom's opinion as to believing or not believing the victim will not be asked. The question about things adding up and questions of that nature that require mom's opinion will not be asked. Mom can absolutely be asked consistent with the rules of evidence about fact questions. I'm not saying mom can't be questioned but she can't be questioned about the things that I said she can't be questioned about.

. . . .

What I'm saying is, you cannot ask her conclusory questions. You can't ask her does this add up. You can't ask her is this consistent, is it inconsistent. You can't do that. We let people do that lots of times because it doesn't hurt it and it makes things go smoother, but when it comes down to the lick log, the jury is the trier of fact, they are the ones who are going to determine whether two pieces of evidence, statements, whatever, are consistent or inconsistent. Mom's opinion is not relevant and will not be asked or sought or laid out there in any way. Fact questions are different.

After the circuit court's ruling, appellant proffered the transcript for our record on appeal.

Ms. Hughes testified that she has known appellant for approximately half of her life. They began living together in 2009 and were married on July 13, 2011. At the time of the rape in 2017, appellant, Ms. Hughes, and the four children were living in a two-bedroom house with a bonus room in Quitman, Arkansas. Fourteen-year-old M.W. slept in one of the bedrooms alone. Appellant routinely worked late and did not come home until after

Ms. Hughes was already asleep. Ms. Hughes admitted that she is a heavy sleeper. Ms. Hughes testified that in June 2017, M.W. and G.S.'s maternal grandmother took the girls to spend a month with her in Arizona. Ms. Hughes joined them for the last week of the vacation and traveled with them to California to spend a week at Disneyland before returning home to Arkansas around July 4, 2017. M.W. immediately went to stay with a friend of hers. However, late in the evening on July 5, 2017, appellant insisted that M.W. return home. Appellant picked M.W. up from her friend's home. Ms. Hughes testified that when appellant returned with M.W., she was on the pull-out couch watching television in the living room and cuddling with the other children. Although Ms. Hughes asked M.W. to join them on the couch because the sheets in M.W.'s room were dirty, appellant objected. Appellant asserted that he had changed the sheets and that M.W. needed to sleep in her own room. Appellant then went to sleep in the other bedroom, and Ms. Hughes admitted that she was not concerned at that time that anything was wrong.

Ms. Hughes explained that M.W.'s behavior was unusual the next day, July 6, 2017. She explained that M.W. would not come out of her room and wanted the door to stay closed. Thinking that M.W. was hiding that she was in a relationship with a boy, Ms. Hughes confronted M.W. and insisted that M.W. tell her what she was hiding and open up to her. Ms. Hughes testified that at that point, M.W. became angry, emotional, and upset. Although appellant objected to the State's eliciting testimony from Ms. Hughes about the out-of-court statements made by M.W., the circuit court overruled the objection under the excited-utterance exception to hearsay. Ms. Hughes stated that M.W. was crying when M.W. told her that appellant had been coming into M.W.'s room every night and forcing

M.W. to have sex with him. Ms. Hughes testified that she immediately took M.W. to the police department to give their statements and then to Arkansas Children's Hospital as directed.

On cross-examination, Ms. Hughes admitted that she and appellant were divorced by the time of trial. She explained that appellant made her feel bad about initially not letting appellant see their son after the allegations and that appellant had subsequently convinced her to allow him to do so. She explained that she had been told that there were no physical findings after the examination at Arkansas Children's Hospital. She further admitted that had the DNA results come back sooner, she would not have let appellant see their son at all after the allegations.

M.W.'s testimony at trial was consistent with her mother's testimony. M.W. testified that during the night, appellant would come into her bedroom and touch her on her breasts and all over her body. She further testified that he penetrated her vagina with his penis. M.W. stated that appellant had sexually assaulted her on the night of July 5, 2017, as he had done many other times. She explained that she had not told her mother sooner because she thought it would be her fault if he got in trouble, and appellant was like a father to her.

At the conclusion of the trial, the jury found appellant guilty of rape and recommended a sentence of twenty-five years, which the circuit court imposed. This appeal followed.

## II. *Cross-Examination of Ms. Hughes*

Appellant does not challenge the sufficiency of the evidence. Instead, he argues that his conviction should be reversed and remanded for a new trial because the circuit court

7

erred in limiting his cross-examination of the victim's mother, Ms. Hughes. He more specifically argues that because the State was allowed to elicit testimony from Ms. Hughes regarding M.W.'s behavior and demeanor when M.W. told her that appellant had raped her and was allowed to discuss the statements M.W. made to her under the excited-utterance exception to hearsay, he should have been allowed to introduce the proffered transcript for impeachment purposes. That transcript contained Ms. Hughes's testimony given in a separate order-of-protection hearing that took place after M.W.'s sexual-assault examination presented no physical findings but before it was confirmed that appellant's DNA was present on a vaginal swab taken during the examination. In response to a question by the circuit court as to whether Ms. Hughes believed M.W., Ms. Hughes testified at the order-of-protection hearing that "I'm on her side. And I want to show I am there for her. Whenever I look at things from an unbiased standpoint, I don't see any evidence and some of the things she says don't line up." On appeal, appellant argues that this testimony was admissible under Arkansas Rules of Evidence 607 and 613(b), and its suppression violated his right to cross-examine a witness as secured under the Sixth Amendment Confrontation Clause. Appellant further cites our supreme court's decision in *Scamardo v. State*, 2013 Ark. 16, 426 S.W.3d 900, for support. In *Scamardo*, our supreme court held that the circuit court abused its discretion under Rule 613(b) in refusing to allow the defense to present the testimony of the victim's aunt that the victim had stated that she was being made to lie after the victim testified that she never made such a statement. However, appellant's arguments and reliance on *Scamardo* are misplaced.

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse a circuit court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Beard v. State*, 2020 Ark. 62, 594 S.W.3d 29. Here, the circuit court agreed with the State that any "question about [M.W.'s] mom believing or not believing" or whether Ms. Hughes opined that "things add[ed] up" is not "relevant" and is "highly prejudicial." It further clarified that although the rules of evidence permit prior inconsistent statements to be used to impeach a witness, they must still be "used consistent with the rules of evidence." We hold that the circuit court did not abuse its discretion in this ruling.

Our appellate courts have consistently recognized that an expert's or a witness's testimony opining or directly commenting on the truthfulness of a victim's statement or testimony is generally inadmissible. *Id.* The rationale behind this rule is that such testimony invades the province of the jury, which alone determines the credibility of the witnesses and apportions the weight to be given to the evidence. *Id.* It is erroneous for the circuit court to permit a witness, in effect, to testify that the victim of a crime is telling the truth. *Id.* Therefore, the circuit court correctly did not allow Ms. Hughes to be questioned regarding her opinion as to whether M.W. was being truthful. Similarly, the circuit court did not abuse its discretion in suppressing evidence that Ms. Hughes's opinion as to M.W.'s truthfulness might have changed as more evidence was learned throughout the investigation. It is true that Arkansas Rule of Evidence 607 provides that the credibility of a witness may be attacked by any party, including the party calling the witness, and that Arkansas Rule of Evidence 613(b) generally allows for the admission of extrinsic evidence of a prior

9

inconsistent statement by a witness to impeach that witness. However, the State argues that "[e]vidence that is admissible under one evidentiary rule can be excludable under another, and the evidence here was clearly inadmissible opinion testimony regarding the truthfulness of the victim's allegations." We agree with the State, and appellant does not specifically address the other rules of evidence that the circuit court used as a basis for suppressing this evidence, including Arkansas Rules of Evidence 401, 402, and 403.

As to appellant's argument that the circuit court's suppression of the above testimony constituted a violation of his rights under the Confrontation Clause, the State argues that his argument is not preserved because it was never raised or ruled on below. We agree. Our appellate courts have repeatedly held that an appellant is limited by the scope and nature of the arguments and objections presented at trial and may not change the grounds for an objection on appeal. *Rayborn v. State*, 2020 Ark. App. 358; *see also Stewart v. State*, 2012 Ark. 349, 423 S.W.3d 69. Our law is well settled that issues raised for the first time on appeal, even constitutional ones, will not be considered because the trial court never had the opportunity to rule on them. *Rayborn, supra.*

Moreover, even assuming arguendo that the circuit court erred in suppressing the transcript, any error was harmless under the facts of this case. This court will declare an error harmless and affirm a conviction when the evidence of guilt is overwhelming and the error is slight. *Beard, supra.* To determine whether the error is slight, we will look to see if the defendant was prejudiced. *Id.* In cases where the victims' testimony is the only evidence supporting a conviction and there are no independent eyewitnesses or physical evidence, we have routinely reversed and remanded. *Id.* However, contrary to appellant's assertion,

this case did not rest on the uncorroborated testimony of the victim. Instead, appellant's DNA was found on a vaginal swab that was taken during M.W.'s sexual-assault examination. Additionally, it is undisputed that Ms. Hughes's testimony regarding her opinion of M.W.'s truthfulness at the order-of-protection hearing occurred before it was determined that DNA found on the vaginal swab matched appellant's DNA within scientific certainty. Further, appellant was able to elicit testimony from Ms. Hughes on cross-examination that appellant made her "feel bad" for not letting him see their son and convinced her to let him do so. Ms. Hughes testified that she regretted that decision, and if the results of the DNA analysis had come back sooner, she would never have allowed appellant to see their son. Thus, even if the circuit court erred, any prejudice was minimal, and the error was slight when considering the overwhelming evidence of appellant's guilt. Accordingly, we affirm appellant's conviction.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Dusti Standridge*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.